UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL MCLAUGHLIN, *ET AL.*,

    Plaintiffs,

v.                                                                  Case No.  21-12661

COMERICA BANK,                                          Sean F. Cox
                                                                       United States District Court Judge
    Defendant.
_____/

## OPINION & ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

    This case involves a wire transfer that Plaintiff Margaret McLaughlin made after she fell victim to a fraudulent scheme by a person who is not a party to this case.  She requested that her bank make a wire transfer of $92,600.00 from her joint bank account with her husband to a bank account at another bank.   Plaintiffs brought this lawsuit against their own bank after the transfer Mrs. McLaughlin requested was executed.  Plaintiffs' primary claim is Count I, titled "Violations of UCC, Article 4A."  (Am. Compl. at 10).  But Plaintiffs also asserted ten common-law counts, that were pled in the alternative.  In an Opinion and Order issued on April 18, 2022, this Court dismissed those alternative counts, leaving Count I as the sole count.  Now, following the close of discovery, the matter is before the Court on Defendant's Motion for Summary Judgment.  The parties have briefed the issues and the Court concludes that oral argument is not necessary.  *See* Local Rule 7.1(f).  For the reasons set forth below, the Court GRANTS Defendant's Motion for Summary Judgment and dismisses the sole remaining count.

**BACKGROUND**

1

Plaintiffs Paul McLaughlin and Margaret McLaughlin filed suit against Defendant Comerica Bank in Wayne County Circuit Court. Defendant removed the action to federal court on November 15, 2021, based on diversity jurisdiction. Following removal, Defendant stipulated to allowing Plaintiffs to file an amended complaint.

Plaintiffs' Amended Complaint, filed on December 20, 2021, asserted the following eleven counts: 1) "Count I – Violation Of UCC, Article 4A;" 2) "Count II – Negligent Misrepresentation With Respect To Plaintiffs' Right To A Refund (Pled in the Alternative);" 3) "Count III – Silent Fraud With Respect To Plaintiffs' Right To A Refund (Pled in the Alternative);" 4) "Count IV – Negligence With Respect To Plaintiffs' Right To A Refund (Pled in the Alternative);" 5) "Count V – Breach Of Fiduciary Duties With Respect To Plaintiffs' Right To A Refund (Pled in the Alternative);" 6) "Count VI – Breach Of Contract (Pled in the Alternative);" 7) "Count VII – Common Law Conversion (Pled in the Alternative);" 8) "Count VIII – Unjust Enrichment (Pled in the Alternative);" 9) "Count IX – Breach Of Fiduciary Duty (Pled in the Alternative);" 10) "Count X – Breach Of Implied Duty Of Good Faith And Fair Dealing (Pled in the Alternative)," 11) "Count XI – Negligence (Pled in the Alternative)."

In an Opinion and Order issued on April 18, 2022, this Court granted in part, and denied in part, a Motion to Dismiss filed by Defendant. The Court dismissed all of the common-law claims in Plaintiffs' Amended Complaint (Count II-XI) as displaced by Article 4A of the Uniform Commercial Code, that governs wire transfers. The Court rejected Defendant's challenges to the sole remaining UCC count, finding them more appropriately raised at the summary judgment phase of the case.

After the close of discovery, on April 3, 2023, Defendant filed the pending Motion for

Summary Judgment.

This Court's practice guidelines and Scheduling Order provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 2-3).

Defendant complied with the Court's practice guidelines for summary judgment motions such that its motion includes a "Statement of Material Facts Not In Dispute" ("Defs.' Stmt.") (ECF No. 21-1) and Plaintiff included a "Counter-Statement of Disputed Facts" (Pl.'s Stmt.") (ECF No. 24-1).

Paul and Margaret McLaughlin are a married couple and, at all relevant times, they had a joint bank account at Comerica Bank. Plaintiffs' sole remaining claim, Count I, stems from a single wire transfer that Margaret McLaughlin requested at one of Defendant's bank branches on July 26, 2021, after Margaret had been contacted by a third-party seeking to fraudulently induce her to make a wire transfer to him.

Plaintiffs claim that Margaret was the victim of a fraudster who convinced her to deceive

3

Comerica when conducting the wire transfer at issue in this case, as follows. (Def.'s Stmt. at ¶ 8; Pls.' Stmt. at ¶ 8). Immediately before leaving her home for Comerica Bank's Mack Avenue branch, Mrs. McLaughlin had spoken by telephone with a person who called himself "Sam Peterson." (*Id.*). Just before Peterson had called her, Mrs. McLaughlin saw a message on her computer that she had been hacked and that a company that traffics in pornography was attempting to take her money. She claims she was unable to access her Comerica accounts online. (*Id.*). When Peterson called her, he told Mrs. McLaughlin that was from Comerica and was calling because of the hack. Peterson convinced Mrs. McLaughlin that she had to transfer her funds to a dummy account right away in order to protect her funds from whomever was trying to take them. Peterson provided wire transfer instructions, that Mrs. McLaughlin wrote down. He instructed her to tell the bank the wire transfer was for a business deal. Immediately after her call with Peterson, and without first informing her husband who was home with her, Mrs. McLaughlin drove to Comerica to make the wire transfer. (Def.'s Stmt. at ¶ 8; Pls.' Stmt. at ¶ 8).

In the late afternoon of July 26, 2021, Mrs. McLaughlin then initiated a funds transfer in person from a Comerica bank branch in Grosse Pointe (the "Mack Avenue" branch), Michigan. Mrs. McLaughlin announced to Comerica staff that she wanted to conduct a wire transfer to Evolve Bank & Trust ("Evolve") in the amount of $92,600. She told Comerica staff that she would pay for her wire transfer out of account xxx2285 which she held jointly with her husband, Paul McLaughlin. Mrs. McLaughlin was an authorized signer on the account and was authorized to use the balance to reimburse Comerica if it accepted her payment order. (Def.'s Stmt. at ¶ 1; Pls.' Stmt. at ¶ 1). Comerica employee Angela Prantzalos at the Mack Avenue branch processed

Mrs. McLaughlin's request according to her instructions. In that regard, Prantzalos worked from Mrs. McLaughlin's handwritten notes containing her wire instructions which included Evolve's name and routing number and identified her designated beneficiary by name and account number. (Def.'s Stmt. at ¶ 2; Pls.' Stmt. at ¶ 2). Mrs. McLaughlin signed the "Wire Transfer – Payment Order Request" form that Prantzalos prepared for her. (Def.'s Ex. 2).

Fedwire denotes Fedwire Funds Service, a real-time, gross settlement system operated by the Federal Reserve, which is used primarily for the transmission and settlement of payment orders. Each transaction is processed individually and settled upon receipt via a highly secure electronic network. Settlement of funds is immediate, final and irrevocable." (Def.'s Stmt. at ¶ 3(c); Pls.' Stmt. at ¶ 3(c)). "An IMAD is a unique identifier assigned by the Federal Reserve to each incoming Fedwire transaction which confirms that the Fedwire transmission has been received by the Federal Reserve." (*Id.* at ¶ 3(d)). Both Comerica and Evolve hold deposit accounts with the Federal Reserve which are identified by ABA routing numbers assigned to the banks. (*Id.* at ¶ 3(e)).

The funds transfer at issue here proceeded in routine fashion through payment and notice to Evolve at 4:33 p.m., with the following occurring:

1) at 4:27 p.m., Prantzalos submitted the transaction into Comerica's system;

2) at 29 seconds past 4:33 p.m., Comerica transmitted its conforming payment order to the Federal Reserve through Fedwire;

3) at 45 seconds past 4:33 p.m., the Federal Reserve acknowledged the transaction by electronic transmission back to Comerica through Fedwire of the following IMAD assigned to this transaction: 0726G1QG990C002143;

4) the Federal Reserve's records indicate that at 4:33 p.m., the Federal Reserve simultaneously debited $92,600 from Comerica's Federal Reserve account, credited $92,600 to Evolve's Federal Reserve account and transmitted its Advice

> of Credit to Evolve via an outgoing Fedwire transmission; and
>
> 5) Evolve's records indicate that at 4:33 p.m., Evolve received payment and notice of the Federal Reserve's transaction instantaneously, i.e., with a payment identifier.

(Def.'s Stmt. at ¶ 3; Pls.' Stmt. at ¶ 3).

At 4:34 p.m., Prantzalos received an internal system email confirming that the transaction had processed successfully, and that Comerica had forwarded the wire on for delivery to Evolve. (Def.'s Stmt. at ¶ 4; Pls.' Stmt. at ¶ 4).

Mrs. McLaughlin became suspicious about Peterson after leaving the Mack Avenue branch, so she telephoned a different Comerica branch (the Fisher Road branch) twice from her car. (Def.'s Stmt. at ¶ 9; Pls.' Stmt. at ¶ 9). Mrs. McLaughlin testified that she spoke with Comerica employee Jackie Doppke on the telephone briefly:

> Q. How long were you on the phone with Jackie Doppke at that time as your –
> A. I guess just a minute. Just a minute. Just enough to say – ask if he was an employee and then to ask her to stop the wire transfer.
> Q. When you hung up on that telephone call, how close were you to the Fisher Road branch?
> A. Six blocks away.

(Mrs. McLaughlin's Dep. at 26). Mrs. McLaughlin testified that she said to Doppke, "Can you call and stop it right away?" (*Id*. at 22). Mrs. McLaughlin then continued driving straight to the Fisher Road branch and, when she arrived, Jackie Doppke was on the telephone when Mrs. McLaughlin got to her desk. (*Id*.). Mrs. McLaughlin testified that, after Doppke got off the telephone, Doppke told her it was too late to stop the wire transfer:

> A. Well, I didn't really, when I think about it, after I called her and got to the bank, she was on the phone already. And we didn't really have a conversation until when she got off [the] phone and turned to me and said,

6

> "I'm sorry, it's too late." She couldn't stop it. She said, "It's already gone through."
> I said, "Oh, my" – well, I was so upset. I said, "Oh, my God, how can that be? It was just a matter of, you know, a 10-15 minute Drive from Lochmoor to Fisher." And, you know, I called and asked her to stop it right away when she said he was not an employee. And obviously I was very upset. I thought by God, I've got to go home and tell my husband what I have done or what, you know, what I fell for.

(Mrs. McLaughlin.'s Dep. at 27-28). Mrs. McLaughlin testified that she stayed at the bank branch past the 5:00 p.m. closing time:

> Q. You stated until about 10 after 5:00 you think?
> A. Yes.
> Q. And what was happening during this time that you stayed after closing?
> A. Nothing much, you know, I was in tears and – and they were just nice enough to, I guess, let me pull myself together before I went home. I had to tell by husband.
> Q, Sure. So --
> A. I just said, "I can't believe that they couldn't stop it."
> And there was a gentleman standing by her desk too. He was not an employee I knew and he said, "No, it's, you know, it is too late."

(*Id.* at 28).

Mr. McLaughlin testified that, when his wife relayed to him what had happened regarding the wire transfer, his wife told him that someone "indicated to her that it was a possibility, possibility of stopping this transaction." (Paul McLaughlin's Dep. at 22).

Peggy Hansen, Plaintiffs' own expert, admits that Comerica accepted Mrs. McLaughlin's payment order minutes before Mrs. McLaughlin first communicated any attempt to cancel her payment. (Def.'s Stmt. at ¶ 5; Pls.' Stmt. at ¶ 5). Hansen further testified that after the Federal Reserve has settled a transaction, it has a policy that it will not enter into an agreement for cancellation. (Hansen Dep. at 60-61).

**STANDARD OF DECISION**

7

Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This Court must view the evidence in the record, and reasonable inferences that can be drawn from those facts, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When reviewing a summary judgment motion, this Court does not weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## ANALYSIS

Electronic fund transfers are governed by Article 4A of the Uniform Commercial Code, that is codified in Michigan at Mich. Comp. Laws § 440.4601 *et seq*.[1] A "payment order" is "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause to another bank to pay, a fixed or determinable amount of money to a beneficiary" bank. Mich. Comp. Laws § 440.4603(a).

The "sender" is the person who gives the instruction for the wire transfer to the "receiving bank." Mich. Comp. Laws § 440.4603(e). Here, Mrs. McLaughlin was the sender and her payment order requesting the wire transfer was given to Comerica as the receiving bank.

---

[1] This Court's April 22, 2022 Opinion and Order explained that Plaintiffs' Amended Complaint directs the Court to Michigan's version of Article 4A of the UCC and that Defendant's briefs asserts that, because the wire transfer at issue went through Fedwire, the 'version of UCC Article 4A that governs this action is the one adopted by Federal Reserve Banks as Appendix B to Subpart B of 12 C.F.R. Part 210 (Regulation J) rather than Michigan's version' of Article 4A. (Def.'s Br. at 5 n.6). That position appears supported by the case law. *See, eg., Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1274 (11th Cir. 2003). But as Defendant notes, the two versions are functionally equivalent, they just have some differences as to the numbering of provisions. (4/18/22 Opinion & Order at 10).

The "beneficiary bank" is the "bank identified in the payment order in which an account of the beneficiary is to be credited pursuant to the order." The "beneficiary" is the "person to be paid by the beneficiary's bank." Mich. Comp. Laws § 440.4603(b) and (c). Here, Evolve Bank & Trust was the beneficiary bank and "Gurdit Singh" (the alleged fraudster) was the beneficiary of the wire transfer. Once the beneficiary bank accepts the order, it is obligated to pay the beneficiary. Mich. Comp. Laws § 440.4904.

A sender may cancel or amend a payment order if the receiving bank is notified "at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication *before the bank accepts the payment order*." Mich. Comp. Laws § 440.4711(2) (emphasis added); U.C.C. § 4A-211(b).

"After a payment order has been accepted, cancellation, or amendment of the order *is not effective unless the receiving bank agrees* or a funds-transfer system rule allows cancellation or amendment without agreement of the bank." Mich. Comp. Laws § 440.4711(3) (emphasis added); U.C.C. § 4A-211(c).

Here, the only remaining count in Plaintiffs' Amended Complaint is Count I, titled "Violations of UCC, Article 4A." (Am. Compl. at 10). In it, Plaintiff asserts that Mrs. McLaughlin made an effective cancellation under Mich. Comp. Laws § 440.4711(2). (Am. Compl. at ¶ 37, "Plaintiff Mrs. McLaughlin made timely objection to the fraudulently induced wire transfer and afforded Defendant more than a reasonable opportunity to act on this cancellation, as she attempted cancellation a mere fifteen minutes after the initiation of the transfer"). In addition, in response to Defendant's Motion to Dismiss, Plaintiffs indicated that they also seek to assert that Mrs. McLaughlin entered into an enforceable oral agreement with

9

Comerica for an untimely cancellation under Mich. Comp. Laws § 440.4711(3).

Now, following the close of discovery, Defendant's summary judgment motion seeks summary judgment in its favor as to both claims. Thus, the motion presents two main issues: 1) whether Comerica accepted Margaret McLaughlin's payment order before she attempted to cancel it, making it legally impossible for her to obtain an agreement for timely cancellation under U.C.C. § 4A-211(b); and 2) whether Comerica and Margaret McLaughlin entered into an effective oral agreement for cancellation of her payment order after Comerica accepted it, under U.C.C. § 4A-211(c). (Def.'s Br. at iv).

I. **Whether Comerica Accepted Margaret McLaughlin's Payment Order Before She Attempted To Cancel It, Making It Legally Impossible For Her To Obtain An Agreement For Timely Cancellation Under Mich. Comp. Laws § 440.4711(2)/UCC § 4A-211(b).**

Defendant Comerica's motion first asserts that Plaintiffs can never prove an effective cancellation under Mich. Comp. Laws § 440.4711(2)/UCC § 4A-211(b) because: 1) that provision allows a sender to cancel payment order by communicating notice of the cancellation to the receiving bank *before* that bank accepts the order; and 2) the evidence here establishes that Comerica bank accepted Margaret McLaughlin's payment order minutes before she communicated any attempt to cancel the payment order.

In response to this challenge, Plaintiffs state that they oppose the motion as to this claim. (*See* Pls.' Br. at i). But the body of Plaintiffs' response brief concedes that, with the benefit of discovery, this first claim fails:

> A sender can effectively cancel a wire transfer by communicating notice of the cancellation to the receiving bank before that bank accepts the payment order according to section 4A-211(b) of the UCC. Therefore, a request for cancellation to a wire transfer "is effective to cancel or amend the order if notice of the communication is received at a time and in a manner affording the

10

> receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order." *Langston & Langston, PLLC v. SunTrust Bank*, 480 F. Supp. 3d 737, 744 (S.D. Miss. 2020); quoting UCC 4A-211(b). *The timeline is not in favor of the Plaintiffs on this ground, given that the payment order was "accepted" at 4:33 p.m. as evidenced by the wire payment confirmations Comerica received. ECF No. 21-5. ECF No. 21-6. ECF No. 21-7. After extensive discovery on this matter, Plaintiffs are not in dispute on this fact.*
> . . . .
> *While Plaintiffs may have lost the opportunity for unilateral cancellation per §4A-211(b) when Comerica Bank accepted the transfer and sent notice to the Federal Reserve, the next bank in the line of transactions using Fedwire, it would be improper to impose such harsh penalties on Plaintiffs when Defendant agreed to cancellation after the acceptance took place . . .*

(Pls.' Br. at 6-8) (emphasis added). Thus, Plaintiffs concede that Comerica is entitled to summary judgment as to this first claim and instead rely exclusively on their second claim – that there was an effective oral agreement for cancellation after the payment order was accepted. Yet, to be sure, Plaintiffs' brief also comments about the perceived unfairness of the applicable UCC provision. (*See* Pls.' Br. at 9, asserting that "the lack of remedies for fraud victims is dreadful. Furthermore, the instantaneous action of wire transfers leaves almost no room for valid cancellation requests, unless they are made immediately . . .").

## II. Whether Comerica And Margaret McLaughlin Entered Into An Effective Oral Agreement For Cancellation Of Her Payment Order After Comerica Accepted It, Under Mich. Comp. Laws § 440.4711(3)/U.C.C. § 4A-211(c).

Again, "After a payment order has been accepted, cancellation, or amendment of the order *is not effective unless the receiving bank agrees* or a funds-transfer system rule allows cancellation or amendment without agreement of the bank." Mich. Comp. Laws § 440.4711(3) (emphasis added); U.C.C. § 4A-211(c).

Plaintiffs do not assert, and have provided no evidence to establish, that a funds-transfer system rule allows for cancellation after acceptance. Rather, Plaintiffs assert that Margaret

11

McLaughlin had an oral agreement with Comerica, under which it agreed to cancel her payment order after it had already been accepted by the bank.

As to this claim of an effective oral agreement for cancellation, Defendant's motion asserts that claim fails for multiple reasons, including: 1) any cancellation agreement with Comerica would have remained ineffective because the Fed does not enter into cancellation agreements; 2) Michigan's statute of frauds prohibits the enforcement of the alleged oral agreement; 3) without Evolve's agreement, the cancellation would have been ineffective; 4) there never was any oral cancellation agreement in the first place; and 5) even if there had been an oral agreement, the required element of "mistake" could not be satisfied under these circumstances.  The Court need not address all of these arguments.

### A. Lack Of Evidence Of Oral Agreement To Cancel After Acceptance

Among other things, Defendant asserts that this claim fails due to the lack of evidence of the alleged oral agreement between Margaret McLaughlin and Comerica bank.

Plaintiffs' Amended Complaint alleges that Defendant "agreed to the cancellation" requested by Mrs. McLaughlin.  (Am. Compl. at ¶ 37).  Plaintiffs' response brief asserts that "Margaret McLaughlin received multiple assurances from various Comerica Bank Employees that the cancellation of her payment order was accepted." (Pls.' Br. at v).  Plaintiffs' brief asserts that unspecified "Comerica employees created a legally binding oral contract when it accepted Plaintiff Margaret McLaughlin's request for cancellation after the payment order was accepted" (Pls.' Br. at 1) and asserts that Comerica must "abide by the promise made to its customer to cancel the wire transfer."  (*Id*. at 5).

12

But Plaintiff has not presented sufficient evidence for a reasonable juror to conclude that there was such an oral agreement between Margaret McLaughlin and any of Comerica's employees.

Notably, Margaret McLaughlin herself (the individual who is alleged to have entered into the oral agreement at issue) did not testify that any Comerica employee made a statement to her wherein they agreed to allow her to cancel the wire transfer after her payment order had been accepted. To the contrary, Margaret McLaughlin testified that the Comerica bank employees she spoke with told her it was too late to cancel her requested wire transfer.

Mrs. McLaughlin testified that, after leaving the Mack Avenue branch, she spoke with Comerica employee Jackie Doppke (at the Fisher Road branch) on the telephone briefly:

> Q. How long were you on the phone with Jackie Doppke at that time as your –
> A. I guess just a minute. Just a minute. Just enough to say – ask if he was an employee and then to ask her to stop the wire transfer.
> Q. When you hung up on that telephone call, how close were you to the Fisher Road branch?
> A. Six blocks away.

(Mrs. McLaughlin's Dep. at 26). Mrs. McLaughlin testified that she said to Doppke, "Can you call and stop it right away?" (*Id*. at 22). Mrs. McLaughlin then continued driving straight to the Fisher Road branch and, when she arrived, Jackie Doppke was on the telephone when Mrs. McLaughlin got to her desk. (*Id*.). Mrs. McLaughlin testified that, after Doppke got off the telephone, Doppke told her it was too late to stop the wire transfer:

> A. Well, I didn't really, when I think about it, after I called her and got to the bank, she was on the phone already. *And we didn't really have a conversation until when she got off [the] phone and turned to me and said, "I'm sorry, it's too late." She couldn't stop it. She said, "It's already gone through."*

13

> I said, "Oh, my" – well, I was so upset. I said, "Oh, my God, how can that be? It was just a matter of, you know, a 10-15 minute Drive from Lochmoor to Fisher." And, you know, I called and asked her to stop it right away when she said he was not an employee. And obviously I was very upset. I thought by God, I've got to go home and tell my husband what I have done or what, you know, what I fell for.

(Mrs. McLaughlin.'s Dep. at 27-28) (emphasis added). Mrs. McLaughlin testified that she stayed at the bank branch past closing time, during which time another Comerica employee told her it was too late to cancel the wire transfer:

> Q. You stated until about 10 after 5:00 you think?
> A. Yes.
> Q. And what was happening during this time that you stayed after closing?
> A. Nothing much, you know, I was in tears and – and they were just nice enough to, I guess, let me pull myself together before I went home. I had to tell by husband.
> Q, Sure. So --
> A. I just said, "I can't believe that they couldn't stop it."
> *And there was a gentleman standing by her desk too. He was not an employee I knew and he said, "No, it's, you know, it is too late."*

(*Id*. at 28) (emphasis added).

Rather than directing the Court to any testimony from Mrs. McLaughlin to support the alleged oral agreement between her and Comerica, Plaintiffs offer Mr. McLaughlin's deposition testimony. They direct the Court to his deposition testimony that, after his wife told him about the incident, she told him some unspecified person told her "that it was a possibility, possibility of stopping the transaction." (Paul McLaughlin Dep. at 22). They also direct the Court to Paul McLaughlin's testimony that, in the days after the transaction, unidentified Comerica employees told him that the computer system showed the transaction as "transaction pending." (*Id*. at 47). No reasonable jury could find an oral agreement based on that evidence. *See Fishcher & Mandell, LP v. Citibank, N.A.*, 2010 WL 2484205 at *8 (S.D. N.Y. 2010) (Rejecting claim that

14

bank agreed to cancel payment order after acceptance where the plaintiff did not claim that bank employee agreed to cancel wire transfer after payment order but agreed to "undertake to do so" and indicated "there was a good chance that the cancel and recall could be accomplished."). That is especially so in light of Margaret McLaughlin's own testimony in this case that she was told it was too late to stop the wire transfer.

**B.      Alleged Oral Agreement Would Be Barred By The Statute Of Frauds**

Defendant further argues that it would be entitled to summary judgment "under the Michigan Statute of Frauds, MCL 566.132(2)," even if Plaintiffs had evidence of Doppke or another Comerica employees verbally promising to Mrs. McLaughlin that Comerica was entering into a cancellation agreement with her. Defendant argues:

> Mich. Comp. Laws § 566.132(2) prohibits an action against a bank on the basis of any promise or commitment for a "financial accommodation" unless the promise is in writing and "signed with an authorized signature by the financial institution." In addition to the signature requirement, the writing must have "substantial probative value in establishing the contract" and must reduce the 'essential terms' to writing. *Blackward Properties, LLC v. Bank of Am.*, 476 F. App'x 639, 641 (6th Cir. 2012).

(Def.'s Br. at 15-16).

In response, Plaintiffs concede that the transaction at issue is a "financial accommodation" for purposes of Michigan's statute of frauds. (Pls.' Br. at 12, "[t]here is no dispute here that the transaction at hand is a financial accommodation) and that the language of Mich. Comp. Laws § 566.132(2) "has been interpreted to be incredibly broad, and Michigan courts" have characterized it as "an unqualified and broad ban." (*Id*.). Despite those concessions, defense counsel then asserts: "Nevertheless, despite this, the oral agreement in this case should not be required to comply with the statute of frauds given what equity demands in a

15

case where an elderly woman had been duped by a fraudster and was easily able to transfer $96,200.00 with minimal questions by staff of Defendant and said staff having made empty promises to Plaintiffs while undergoing various steps in pursuit of that promise." (Pls.' Br. at 12).

To the extent that Plaintiffs assert that they can avoid the statute of frauds based upon partial performance, that argument fails. Plaintiffs direct the Court to *Barclae v. Zarb*, 300 Mich.App 455 (2013) wherein the court explained that the "doctrine of partial performance applies primarily in actions involving land," and stated its requirements as follows:

> If one party to an oral contract, in reliance upon the contract, has performed his obligation thereunder so that it would be a fraud upon him to allow the other party to repudiate the contract, by interposing the statute, equity will regard the contract as removed from the operation of the statute. The contract to be enforced must be established by clear and convincing evidence. [*Guzorek v. Williams*, 300 Mich. 633, 638–639, 2 N.W.2d 796 (1942)

*Id*. at 475.

This action does not involve land; rather it involves an alleged oral agreement concerning a wire transfer. Plaintiffs have not offered "clear and convincing evidence" of the alleged oral contract. And as Comerica notes in its reply brief, Plaintiffs have not "articulate[d] any *conduct by the plaintiffs* that could be construed as partial performance for whatever oral agreement they claim they reached with Comerica staff." (Def.'s Reply Br. at 3) (emphasis added). This exception to the statute of frauds does not apply.

To the extent that Plaintiffs are attempting to invoke promissory estoppel to avoid Michigan's statute of frauds, that argument fails too. *See, eg,, Blackward Properties, LLC*, 476 F. App'x at 641-42 (explaining that "*Crown Technology Park v. D & N Bank, FSB*, 242 Mich.App. 538, 619 N.W.2d 66, 73 (2000), defeats [the plaintiff's] promissory estoppel

16

argument."); *Trombley v. Seterus, Inc.*, 614 F. App'x 829, 835 (6th Cir. 2015) (rejecting promissory estoppel claim as barred by Michigan's statute of frauds, based upon *Crown Tech. Park*); *McCann v. U.S. Bank, N.A.*, 873 F.Supp.2d 823, 835 (E.D. Mich. 2012) ("[A]s the Michigan Court of Appeals has pointedly observed, promissory estoppel is a judicially-created doctrine. Applying it to circumvent the statute of frauds would be "contrary to well-founded principles of statutory construction and is inconsistent with traditional notions of the separation of powers between the judicial and legislative branches of government.").

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: June 22, 2023